Ana GUSTAVE–SCHMIDT, Plaintiff,

v.

Elaine L. CHAO, et al., Secretary,
Department of Labor,
Defendants.

No. Civ.A. 01–0781(RBW).

United States District Court,
District of Columbia.

Sept. 30, 2002.

Beverly Russell, Assistant United States Attorney, Washington, D.C., for defendant.

David Murphy, Kooritzky & Associates, Arlington, VA, for plaintiff.

### MEMORANDUM OPINION

WALTON, District Judge.

This matter comes before the Court upon defendants' first and second motions

for partial dismissal of plaintiff's complaint alleging intentional and negligent infliction of emotional distress under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2401–2680 (2000), and violations of both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e (2000), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 630(f) (2000). The defendants seek dismissal under either Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6). Upon consideration of the parties' submissions and for the reasons set forth below, the Court must grant the defendants' motion to dismiss the plaintiff's negligent and intentional infliction of emotional distress claims, and deny the defendants' motion to dismiss the plaintiff's claims under Title VII and the ADEA for failure to exhaust administrative remedies.

### I. *Factual Background*

The plaintiff, a forty-eight year-old Hispanic woman, was employed as an international economist at the United States Department of Labor ("DOL") from March 10, 1991, to March 3, 2000.[1] Complaint ("Compl.") at 3. In reciting the applicable facts of this case, the Court will set forth separately those facts that relate specifically to the plaintiff's workplace harassment and discrimination claims, his failure to promote claim, and the arbitration process.

### (A) *Allegations Involving Workplace Harassment and Discrimination*

From July 22, 1992, and until the termination of her employment with the defendant, the plaintiff worked at the DOL's Division of Economic Research in the In-

ternational Labor Affairs Bureau ("ILAB").[2] *Id.* From at least September 1, 1994, and until her termination, the plaintiff's direct supervisor was Defendant Gregory Schoepfle ("Supervisor" or "Defendant Schoepfle"). *Id.* at 6. On October 17, 1997, the plaintiff was apparently questioned by two agents of the DOL's Office of Inspector General ("OIG") regarding whether she sent a forged letter that was represented to be from a high-level DOL employee to the President of the Inter–American Bank of Development ("IABD").[3] *Id.* at 8. On July 7, 1998, during the course of this investigation, the plaintiff learned that two OIG agents wanted to speak to her and she apparently requested the presence of her Local 12, AFGE, AFL—CIO ("Local 12") union representative during the interview. However, after one of the OIG agents unsuccessfully attempted to contact the plaintiff's union representative, the plaintiff requested the presence of another union representative at the interview, which was allegedly denied by the OIG agents. *Id.* The plaintiff asserts that at this interview, the two OIG agents attempted to pressure her into signing a confession stating she had written the forged letter and had sent it to the President of the IABD. *Id.* Furthermore, the plaintiff alleges that the OIG failed to reasonably investigate the matter and that her Supervisor informed the agents that the signature and the use of expressions in the letter in question were similar to the plaintiff's handwriting and writing style, and pointed to a typewriter near the plaintiff's office which he said produced a similar "style of type" to that of the forged letter. *Id.* at 8–9. The plaintiff asserts that due to her Supervisor's statements to

---

**1.** The plaintiff notes that at all times relevant to this case, she was over the age of forty. *Id.* at 3.

**2.** The plaintiff's tenure also included an assignment with the International Labor Office

of the United Nations in Geneva, Switzerland. *Id.* at 4.

**3.** Apparently, this letter contains derogatory statements about a cousin of the plaintiff who is an employee at the IABD. *Id.* at 8.

the OIG, she was the focus of the investigation into the origin of the forged letter. *Id.* at 9. On January 13, 1999, the plaintiff's Supervisor, and on June 11, 1999, the IALB Director, notified the plaintiff of their intention to suspend the plaintiff for fourteen days without pay for authoring this forged letter. *Id.* at 10. The plaintiff also asserts that on April 1, 1999, she was allegedly reprimanded by her Supervisor who shouted at her in close proximity to her fellow co-workers about a research paper that she had been working on. *Id.* This incident allegedly resulted in the plaintiff visiting the DOL's Health Unit. *Id.* On October 13, 1999, the plaintiff's Supervisor issued a proposal to remove the plaintiff from her position for intentionally misrepresenting two research documents as her own independent work, although she asserts that she never claimed authorship for either of these documents. *Id.* at 11. Finally, the plaintiff claims that beginning in October 1999, and continuing until her termination, the defendants were "engaged in monitoring the [p]laintiff's whereabouts, and her arrivals and departures from the DOL building during her customary working hours." *Id.* She asserts that she is unaware of any other DOL employee being monitored in such a manner. *Id.*

### (B) *Allegations Involving Failing to Promote*

On January 8, 1999, the plaintiff applied for a vacancy in the ILAB and, according to the plaintiff, on January 11, 1999, the DOL allegedly modified the position description "from a GS–11/12 to a GS–11/12/13 to the advantage of an applicant outside of the DOL."[4] *Id.* Apparently, while the plaintiff was qualified for this position at all three of these GS levels, the DOL chose an applicant from outside of the ILAB who was "a white female under the age of forty years" and who did not have a Ph.D. degree like the plaintiff. *Id.* at 6–7.

### (C) *The Arbitration Process*

At all times relevant to this case, Local 12 was the collective bargaining unit and the "designated agency" for the negotiated grievance procedure under the collective bargaining agreement between the DOL and the plaintiff.[5] *Id.* at 4. On May 10, 1999, the plaintiff filed her first grievance with Local 12 with allegations regarding her work environment, public humiliation, and a pattern of harassment, which was "invoked to arbitration" in either August or September 1999.[6] Compl. at 3–4; Plaintiff's Opposition to Defendants' Motion for Partial Dismissal of Plaintiff's Complaint ("Pl.'s Opp'n") at 13. On June 17, 1999, the plaintiff filed her second grievance with Local 12 regarding her suspension for the forged letter incident. Compl. at 4. This grievance was apparently supposed to be arbitrated on December 6, 1999, but the DOL cancelled the hearing. *Id.* On July 12, 1999, the plaintiff filed her third grievance with Local 12 regarding "a merit system violation and hostile treatment by" her Supervisor. Compl. at 4; Pl.'s Opp'n at 13. On July 15, 1999, the

---

4. In fact, the plaintiff states that beginning on December 1, 1994, she applied for at least eleven GS–13 positions within the ILAB. *Id.* at 6.

5. Apparently during the course of the plaintiff's employment at the DOL she served in various positions with Local 12, including "Union Steward" from 1995 to 1997, a member of the Civil Rights Committee from 1998 until her discharge, and was elected to the Executive Board on February 16, 2000. *Id.* at 5–6.

6. The plaintiff's complaint list the date that arbitration was invoked as August of 1999, while her opposition to the defendants' motion for partial dismissal of the complaint specifically lists the date as September 16, 1999. *See* Compl. at 4; Pl.'s Opp'n at 13.

plaintiff filed a complaint of discrimination on the bases of national origin, sex, and age with the Equal Opportunity Office ("EOO") of the DOL due to her non-selection for a position as a GS–13–14 economist. Compl. at 4. Finally, on November 24, 1999, the plaintiff filed a fourth grievance with Local 12, in which she alleged retaliatory discharge by her Supervisor. Pl.'s Opp'n at 14.

From February 14–17, 2001, an arbitration hearing was conducted, in which the arbitrator considered the plaintiff's retaliatory discharge claim and her allegations of misconduct by defendants concerning: the OIG investigation, her proposed suspension, and the workplace harassment.[7] Compl. at 4–5. The arbitrator subsequently denied the plaintiff's grievance on June 5, 2000. *Id.* at 5. The plaintiff filed an appeal of the arbitrator's decision with the Merit System Protection Board ("MSPB") on July 10, 2000. *Id.* On March 14, 2001, the MSPB issued its final decision denying the plaintiff's petition and the plaintiff subsequently filed a complaint with this Court on April 12, 2001. Pl.'s Opp'n at 14.

## II. *Standard of Review*

### (A) *Rule 12(b)(1)*

 Federal Rule of Civil Procedure 12(b)(1) requires the plaintiff to bear the burden of establishing by a preponderance of the evidence that the court has jurisdiction to entertain her claims. Fed.R.Civ.P. 12(b)(1); *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001) (holding that the court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."); *Pitney Bowes, Inc. v. United States Postal Serv.,* 27 F.Supp.2d 15, 18 (D.D.C.1998); *Darden v. United States,* 18

Cl.Ct. 855, 859 (Cl.Ct.1989). While the Court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), because the plaintiff has the burden of proof to establish jurisdiction, the " 'plaintiff's factual allegations in the complaint ... will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police,* 185 F.Supp.2d at 13–14 (citation omitted). Finally, the Court notes that in deciding a 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint but may consider material outside of the complaint in an effort to determine whether the court has jurisdiction in the case. *See EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997); *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987); *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir. 1986); *Grand Lodge of Fraternal Order of Police,* 185 F.Supp.2d at 14.

### (B) *Rule 12(b)(6)*

 On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must construe the allegations and facts in the complaint in the light most favorable to the plaintiff and must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

---

**7.** Apparently, the only incident not presented to the arbitrator was the one involving the alleged altering of the "certificate list of eligibles" for merit staffing by the plaintiff's Supervisor, which was not discovered until after the Complaint was filed and during a subsequent arbitration hearing that was conducted on April 18, 2001. Pl.'s Opp'n at 14–15.

L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). However, the Court need not accept inferences or conclusory allegations that are unsupported by the facts set forth in the complaint. *Kowal*, 16 F.3d at 1276. In deciding whether to dismiss a claim under Rule 12(b)(6), the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice. *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25. The Court will dismiss a claim pursuant to Rule 12(b)(6) only if the defendants can demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

### III. *Legal Analysis*

#### (A) *Plaintiff's Claims Arising Under the Federal Torts Claims Act*

This Court must begin its analysis with an examination of the FTCA. The plaintiff's complaint alleges that the defendant committed the torts of negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED"). The plaintiff asserts that these torts arise in the following two general

contexts: personnel decisions, *i.e.*, the proposal to suspend her, the termination of her employment, treatment by her supervisor and non-promotion, and the investigation that was conducted by the defendant. The defendants assert that such claims are barred by the doctrine of sovereign immunity. Defendants' Motion for Partial Dismissal of Plaintiff's Complaint ("Def.'s Mot.") at 4.

While the FTCA authorizes federal courts to hear suits against the United States, *see* 28 U.S.C. § 1346(b) (2000), Congress has placed certain limitations on this broad waiver of sovereign immunity in 28 U.S.C. § 2680 (2000). *Cope v. Scott*, 45 F.3d 445, 447–48 (D.C.Cir.1995). Pertinent to this case is the "discretionary function" exception of § 2680(a), which states, in part, that the United States will not be liable under the FTCA for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the discretionary function exception applies, then this Court must dismiss the FTCA claims pursuant to Federal Rule of Civil Procedure 12(b)(1) because it lacks subject matter jurisdiction to entertain the two common law tort claims.[8] *See Burk-*

---

8. While the parties do not raise this issue, the Court notes that some courts have examined the interchange between the exception listed in § 2680(a) (discretionary function exception) and those acts listed in § 2680(h) (enumerated intentional torts), and whether an intentional tort not listed in § 2680(h) can qualify under the discretionary function exception of § 2680(a). The District of Columbia Circuit's opinion in *Gray v. Bell*, 712 F.2d 490, 507 (D.C.Cir.1983) made it clear that "the plain language of 28 U.S.C. § 2680(a) states that the FTCA's general waiver of sovereign immunity is inapplicable to '*any* claim' based on a discretionary function." In examining the interplay between the enumerated exception for "acts or omissions of investiga-

tive or law enforcement officers of the United States Government" in § 2680(h) and the discretionary function exception of § 2680(a), the Circuit Court held that the two provisions operate independently. *Id.* at 507–08 (finding that a plaintiff must satisfy both Sections 2680(a) and (h) independently to overcome a sovereign immunity defense); *see Medina v. United States*, 259 F.3d 220, 224–25 (4th Cir. 2001) (noting that the District of Columbia Circuit resolved the question about the interplay between § 2680(h) and § 2680(a) by "conclud[ing] that the two sections of the statute exist independently"). The Circuit Court came to this conclusion because "statutes which waive [the] immunity of the Unit-

*hart v. WMATA,* 112 F.3d 1207, 1216 (D.C.Cir.1997) (citing *Edelman v. Jordan,* 415 U.S. 651, 678, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ("holding that Eleventh Amendment claim cannot be waived as it is jurisdictional")); *Cope,* 45 F.3d at 448.

■ The Supreme Court has fashioned a two-part test to determine whether a claim will be barred under the discretionary function exception. *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). First, this exception "covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice.' ... [and will] not [be] satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow.' " *Id.* at 322, 111 S.Ct. 1267 (quoting *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). Second, even "if the challenged conduct involves an element of judgment [it must be] ... of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23, 111 S.Ct. 1267 (quoting *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954). The Court explained that such decisions must be "grounded in social, economic, and political policy." *Id.* at 323, 111 S.Ct. 1267. Courts have explained that Congress fashioned this exception by balancing, on one hand, the purpose behind the FTCA to give plaintiffs the same rights as they would have against private individuals when government employees commit tortious acts within their scope of employment, on the other hand, with the concern of protecting against "judicial intrusion into areas of governmental operations and policymaking." *Gray v. Bell,* 712 F.2d 490, 507 (D.C.Cir.1983). With these principles in mind, the Court will now examine the plaintiff's two common law claims and whether they are barred by sovereign immunity.

### (1) *Employee Personnel Decisions*

■ The plaintiff's NIED and IIED claims, as stated in her complaint, involve allegations concerning personnel decisions, including the proposal to suspend her from her employment, the termination of her employment, the treatment by her supervisor, and her non-promotion. Specifically, the plaintiff alleges in her complaint that she suffered both intentional and negligently inflicted emotional distress arising from the following: her applications for eleven positions with the ILAB and the subsequent denials for each of these promotions, Compl. ¶ 33; her supervisor improperly yelling at her about her work product, Compl. ¶¶ 39–41; her supervisors improperly suspending her for allegedly writing the letter to the President of the IABD, Compl. ¶¶ 57–58; and, her ultimate termination allegedly arising from the filing of her complaints with the Local 12 and the DOL's EEO office, Compl. ¶ 89. The District of Columbia Circuit has held that "decisions concerning the hiring, training, and supervision [of a sovereign entity's] employees are discretionary in nature, and thus immune from judicial review." *Beebe v. WMATA,* 129 F.3d 1283, 1287 (D.C.Cir.1997) (quoting *Burkhart,* 112 F.3d at 1217). The Circuit Court explained that "hiring decisions of a public entity require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, 'in-

ed States from suit are to be construed strictly in favor of the sovereign ..." *Gray,* 712 F.2d at 507 (quoting *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951)). The Fourth Circuit, commenting on *Gray's* analysis, stated that it "must assume that, when Congress amended § 2680(h) in 1974, it was aware of § 2680(a) and its contours." *Medina,* 259 F.3d at 225 (citing *Cannon v. Univ. of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) ("It is always appropriate to assume that our elected representatives ... know the law")).

dividual backgrounds, office diversity, experience and employer intuition.'" *Burkhart,* 112 F.3d at 1217. The Circuit Court also noted that "supervision decisions involve a complex balancing of budgetary considerations [and] employee privacy rights ..." *Id.* Thus, the Circuit Court concluded that both hiring and supervision decisions "are surely among those involving the exercise of political, social, or economic judgment." *Id.* (citing *Kirchmann v. United States,* 8 F.3d 1273, 1277 (8th Cir.1993) ("holding that supervision of government contractors is a 'discretionary function' "); *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995) ("stating that issues of employee supervision and retention generally fall within the discretionary function exception"); *K.W. Thompson Tool Co. v. United States,* 836 F.2d 721 (1st Cir.1988) ("holding that failure to properly train and supervise EPA personnel falls within discretionary function exception")).

Furthermore, the plaintiff's claim involving her supervisor's alleged yelling about her work product also falls into this "discretionary function" category, because as the Third Circuit explained, supervisors "must be able to speak freely to their employees without 'apprehension that the motives that control [their] official conduct may, at any time, become the subject of inquiry in a civil suit for damages.' " *Araujo v. Welch,* 742 F.2d 802, 806 (3rd Cir.1984) (quoting *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780 (1896)) (dismissing plaintiff's intentional infliction of emotional distress claim finding that supervisor's harassing language which discussed work-related matters advanced legitimate objectives of the office); *see Andrejko v. Sanders,* 638 F.Supp. 449, 453 (M.D.Pa.1986) (finding that "mere verbal abuse ... is a discretionary act within the perimeter of [a supervisor's] official duties"). In addition, this Court finds that a personnel decision regarding whether to promote an employee is also considered "discretionary in nature, and thus immune from judicial review." *Beebe,* 129 F.3d at 1285–1288 (District of Columbia Circuit Court affirming trial court's ruling that plaintiff's tort claims arising out of a decision by the defendant not to select him for a position that he applied for was not cognizable because such an employment decision was discretionary in nature); *see Gnotta v. United States,* 415 F.2d 1271, 1276 (8th Cir.1969) (affirming district court's dismissal of non-promotion claim under the Administrative Procedures Act). Finally, the defendants' personnel decisions regarding the plaintiff's suspension and subsequent termination also clearly fall within the discretionary function exception to the FTCA. The District of Columbia Circuit stated that the "decision to suspend [a] plaintiff[ ] ... falls well within [the] rubric" of discretionary functions. *Sloan v. HUD,* 236 F.3d 756, 760 (D.C.Cir. 2001) (applying the *Gaubert* two-pronged test to conclude that "HUD's suspension of plaintiffs is protected by the discretionary function exception"). Similarly, the Tenth Circuit has commented that "[d]ecisions regarding employment and termination are inherently discretionary ... [because s]uch decisions are precisely the types of administrative action the discretionary function exception seeks to shield from judicial second-guessing." *Richman v. Straley,* 48 F.3d 1139, 1146–47 (10th Cir. 1995); *see Tonelli,* 60 F.3d at 496 ("[i]ssues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception").

### (2) *Investigations of Employees*

▪ The plaintiff has also alleged that she sustained emotional injury as a direct result of the OIG's improperly conducted investigation into the origin of the forged letter that was sent to the President of the IABD. Compl. ¶¶ 42–56. The District of Columbia Circuit has stated that "[t]he

decision to initiate a prosecution has long been regarded as a classic discretionary function." *Sloan*, 236 F.3d at 760 (citations omitted); *see Gray*, 712 F.2d at 513 (describing prosecutorial decisions as a "quintessential example[ ] of governmental discretion"). The Circuit Court has treated prosecutorial decisions and decisions to initiate administrative proceedings by an agency, such as the DOL, as analogous discretionary counterparts. *Sloan*, 236 F.3d at 760 (citing *Butz v. Economou*, 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)) (holding that "[t]he decision to initiate administrative proceedings against an individual ... is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought ...."). The decision to prosecute or to initiate an administrative proceeding generally having been the byproduct of an investigation, logically calls for the investigation itself also being treated as a discretionary function. *See Gray*, 712 F.2d at 515–16 (treating investigatory conduct as "inextricably tied" to decision to prosecute).

While the plaintiff's complaint alleges that the OIG violated her right to have a union representative present when she was questioned by the agents and that she was harassed, intimidated and pressured to sign a confession, the District of Columbia Circuit has held that even if there was an "improper, torious, and [a] constitutionally defective manner in which the investigation was carried", if the improper conduct is "inextricably tied" to the overall discretionary decision to investigate and then prosecute a plaintiff, then such actions cannot support an FTCA suit. *Gray*, 712 F.2d at 515–16 (finding that a plaintiff must allege that the defendant "breached a duty sufficiently separable from the decision-making function to be non-discretionary and outside the exception"). Here, the plaintiff's allegations about the investigative methods cannot be separated from the defendants' disciplinary actions. Accordingly, they are "inextricably tied" to one another and must be considered collectively as discretionary functions.[9]

■ Finally, the Court concludes that the plaintiff's claims under the FTCA against Defendant Schoepfle must also be dismissed. Pursuant to 28 U.S.C. § 2679 (2000), the defendants have submitted a certification[10] that Defendant Schoepfle

---

**9.** It is not clear whether the plaintiff is advancing the allegations regarding the alleged improper investigation by the OIG as support for her common law claims under the FTCA. This is because in response to the defendants' Second Motion for Partial Dismissal of Plaintiff's Complaint, in which the defendants asserted that the plaintiff's allegations that the defendants violated the Labor Management Relations Act., 29 U.S.C. §§ 157 *et seq.* (2000), by not allowing a union representative to be present at the OIG interview should be dismissed since there is no private cause of action for such a violation, the plaintiff responded that the allegations regarding the right to representation, "along with the intimidation, threats of criminal prosecution, and remarks regarding the shame that would be placed on the Plaintiff's family, are part of the pattern of facts underlying the Plaintiff's hos-

tile work environment/disparate treatment claims under Title VII ... and the ... ADEA." Plaintiff's Opposition to Defendants' Second Motion for Partial Dismissal of Plaintiff's Complaint at 3. However, later on in her response, the plaintiff states that the OIG's denial of her right to union representation "is cited ... to fully demonstrate how the Defendants' actions clearly exceeded the scope of the discretionary function exception to the FTCA." *Id.* Thus, the Court includes the plaintiff's allegations regarding the alleged improperly conducted investigation in the event the plaintiff intended to assert it as part of her FTCA claim.

**10.** The certification is from the Chief of the Civil Division of the United States Attorney's Office for the District of Columbia, who was

"was acting within the scope of his authority as an employee of the United States at the time of such alleged incidents." Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Partial Dismissal of Plaintiff's Complaint ("Def.'s Reply"), Exhibit ("Ex.") 1. Section 2679(d)(1) states that

[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such a claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

Therefore, having concluded that this Court lacks subject matter jurisdiction to entertain the plaintiff's NIED and IIED claims under the FTCA because the United States is immune from such a suit for the acts underlying those claims under the discretionary function exception to the FTCA, and because Defendant Schoepfle cannot be individually sued under the FTCA, the Court will grant the defendants' motion to dismiss those claims.

**(B)** *Plaintiff's Claims Arising Under Title VII & ADEA*

This Court next turns to the defendants' motion to dismiss those claims alleged by the plaintiff in her complaint under Title VII and the ADEA. As mentioned above, the plaintiff and the DOL entered into a collective bargaining agreement with Local

12 as the designated agency for the negotiated grievance procedure.[11] Compl. at 4. Because the plaintiff is challenging both her termination and the alleged illegal discriminatory reason for her termination "based on [her] race, age, sex, national origin, and previous complaints of discrimination", *id.* at 12, the plaintiff's complaint falls into the "mixed case" category of the Civil Service Reform Act ("CSRA"). *See American Fed. of Gov't Employees, Local 2052 v. Reno*, 992 F.2d 331, 332 (D.C.Cir. 1993). In mixed case situations, the CSRA provides for two independent grievance procedures from which a plaintiff must select, *i.e.*, statutory procedures or the negotiated grievance procedure. *See* 5 U.S.C. § 7121(d) (2000). In this case, apparently pursuant to the collective bargaining agreement, the plaintiff must first file a grievance with the defendant and upon the grievance being "invoked to arbitration, the arbitration hearing must be held within ninety (90) days of that event." Pl.'s Opp'n at 13. Upon receiving the arbitrator's decision, the CSRA provides for a mandatory appeal to the Merit Systems Protection Board ("MSPB") by a plaintiff in a mixed case prior to seeking judicial review. 5 U.S.C. § 7121(d); *Local 2052*, 992 F.2d at 336. Although the plaintiff filed four separate grievances, the Court need only address the defendants' motion to dismiss the hostile work environment and merit system violation allegations, which were alleged in the plaintiff's May 10, 1999 and July 12, 1999 grievances that had been filed with Local 12.[12] Moreover, the Court notes that although the defen-

given the authority to file such a certification pursuant to 28 C.F.R. § 15.3.

**11.** Although it is apparent that a collective bargaining agreement was entered into by the parties, neither party has provided to the Court a copy of the agreement or the relevant portions of the agreement that cover the grievance procedures.

**12.** The defendants have not sought to dismiss the plaintiff's allegations contained in her June 17, 1999 grievance, regarding her suspension; her November 24, 1999 grievance, regarding her discharge; nor her July 15, 1999 complaint of discrimination, regarding her failure to be promoted.

dants originally sought to dismiss the plaintiff's discrimination claims regarding "the proposal to suspend, yelling and other alleged wrongful treatment by her supervisor, monitoring of her workplace activities . . .", Def.'s Mot. at 13–17, the Court need not address those allegations as actionable claims because the plaintiff stated in her opposition that she "does not raise these claims as separate and distinct claims, or assert them as adverse employment consequences", Pl.'s Opp'n at 15–16. Thus, because the plaintiff acknowledges that such allegations do not amount to adverse actions, they need not be considered as cognizable discrimination or retaliation claims under Title VII. *See Brown v. Brody,* 199 F.3d 446, 452–53 (D.C.Cir.1999) ("A common element required for discrimination and retaliation claims against federal employers . . . is thus some form of legally cognizable adverse action by the employer.").

It is axiomatic that "[c]omplainants must timely exhaust . . . [available] administrative remedies before bringing their claims to court." *Id.* (citing *Brown v. GSA,* 425 U.S. 820, 832–33, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Bayer v. United States Dept. of the Treasury,* 956 F.2d 330, 332 (D.C.Cir.1992)). Individuals "who fail[ ] to comply, to the letter, with administrative deadlines 'ordinarily will be denied a judicial audience.' " *Brown v. Marsh,* 777 F.2d 8, 14 (D.C.Cir.1985) (quoting *Shehadeh v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711, 727 (D.C.Cir.1978)). Administrative time limits contained in Title VII are not "jurisdictional bars to bringing suit . . . but function[ ] like statutes of limitations, [and] these time limits are subject to equitable tolling, estoppel, and waiver." *Marsh,* 777 F.2d at 14 (citations omitted). In this Circuit it is clear that "[b]ecause untimely exhaustion of administrative remedies is an affirmative defense, the defendant[s] bear[ ] the burden of pleading and proving it. If the defen-

dant[s] meet[ ] [their] burden, the plaintiff then bears the burden of pleading and proving facts supporting equitable avoidance of the defense." *Bowden,* 106 F.3d at 437 (citations omitted).

■■■ In this case, after reciting the applicable legal principles, the defendants simply state that the plaintiff "has not asserted any facts evidencing exhaustion of administrative remedies on her claims based on . . . hostile work environment[ ] and [a] violation of merit system principles. Accordingly, these claims must be dismissed." Def.'s Mot. at 14. However, the plaintiff's complaint asserts that:

> On or about February 14, 200[0] through February 17, 2000, Plaintiff's retaliatory discharge grievance and grievances relating to other acts which created a pattern of continuing violations, including but not limited to, the Office of Inspector General's investigation of the Plaintiff, her proposed suspension by Defendant, and the on-the-job harassment by the Defendant, were considered in an arbitration hearing.

Compl. ¶ 19. The plaintiff goes on to explain that the grievance was denied by the arbitrator and after an appeal to the MSPB, which upheld the arbitrator's decision, and the filing of a Standard Form 95 (Claim for Damage, Injury, or Death) with the DOL's Office of the Solicitor "specifying the underlying bases and facts for her claims of intentional and negligent infliction of emotional distress[,]" she filed a civil claim with this Court. *Id.* ¶¶ 20–24. While it appears that the arbitration hearing that took place in February 2000 was the result of the plaintiff's allegation of retaliatory discharge in her fourth grievance, the plaintiff asserts both in her complaint and in her opposition to the defendants' motion that the arbitrator "heard all of the claims, relating to the discrimination claims in this lawsuit, and to the miscon-

duct of [her Supervisor]." Pl.'s Opp'n at 14; see Compl. ¶ 19.

The defendants' reply, in a footnote, seemingly argues that the plaintiff failed to exhaust her administrative remedies with respect to her May 10, 1999 and July 12, 1999 grievances because she was informed that such grievances would not proceed to arbitration, that she was informed of her right to appeal, that she abandoned the administrative process out of frustration with it and that she now "seek[s] access to this Court through equitable means[.]" Defs.' Reply at 12 n. 7 (citing Pl.'s Opp'n Ex. PA 7 (e-mail from the Chairman of the Green Light Committee stating that plaintiff's two grievances being held in abeyance would not proceed to arbitration and that she could appeal that decision to the union's Executive Board and subsequently to the membership)). However, this observation is inconsistent with the plaintiff's assertion in her opposition that she received a letter via e-mail dated October 17, 2000, informing her that her claims would not proceed to arbitration, that she was informed on November 14, 2000, by the President of her Labor Bargaining Unit that an arbitration hearing would not be held because she was terminated, that because of her termination no remedy was available to her. Despite these representations, the plaintiff states that she

> was aware of the peril of withdrawal from these grievances/arbitration procedures as potentially raising the issue of failure to exhaust administrative remedies. Therefore, once the Arbitrations were finally convened, thirteen and fifteen months after her termination, the Plaintiff cooperated fully with her Local 12 representatives, demonstrating her continued adherence to the principles of administrative exhaustion.

Pl.'s Opp'n at 13–14. Thus it appears that the plaintiff did not abandon the administrative process.

The Court undertakes its review of the defendants' motion to dismiss the plaintiff's claims of a hostile work environment and the merit system violations, for allegedly failing to exhaust her administrative remedies, from the perspective that it must "construe the allegations and facts in the complaint in the light most favorable to the plaintiff[, it] must grant the plaintiff the benefit of all inferences that can be derived from the alleged facts", Conley, 355 U.S. at 45–46, 78 S.Ct. 99; Kowal, 16 F.3d at 1276, and because the defendants are asserting an affirmative defense, they bear the burden of pleading and proving that the plaintiff did in fact fail to exhaust her administrative remedies, Bowden, 106 F.3d at 437. With this guidepost directing the Court's analysis, it must deny the defendants' motion to dismiss the plaintiff's hostile work environment and merit system violation claims. Construing the facts stated in the complaint in the light most favorable to the plaintiff, and granting the plaintiff all reasonable inferences from those facts, the Court concludes that the absence of contradictory evidence or allegations from the defendants about whether these claims were presented to the arbitrator requires the finding that the arbitrator in the retaliatory discharge arbitration hearing held in February 2000 heard evidence and considered evidence about the plaintiff's hostile work environment and merit system violation claims. And while it appears that these claims may have also been the specific subject of grievances that were arbitrated after the complaint in this case was filed, it is nevertheless clear that the DOL was on notice of these claims when the grievance related to the retaliatory discharge was administratively reviewed and processed because the retaliatory discharge was based in part on these prior complaints of discrimination. See Compl. ¶ 73.

The District of Columbia Circuit has stated that exhaustion

> is not an end in itself; it is a practical and pragmatic doctrine that must be tailored to fit the peculiarities of the administrative system Congress has created. Exhaustion under Title VII, like other procedural devices, should never be allowed to become so formidable a demand that it obscures the clear congressional purpose of rooting out ... every vestige of employment discrimination within the federal government.

*Marsh*, 777 F.2d at 14 (internal quotations and citations omitted). The Circuit Court has also explained that "Congress wanted to give each agency the opportunity as well as the responsibility to right any wrong that it might have done[, but that it never] wanted the exhaustion doctrine to become a massive procedural roadblock to access to the courts[, and that it] contemplated that the exhaustion doctrine would be held within limits consonant with the realities of the statutory scheme." *Id.* (internal quotations and citations omitted).

In this case, while it appears that the plaintiff's grievances specifically alleging a hostile work environment and a violation of the merit system were not themselves timely exhausted prior to filing the civil complaint, these claims were related to the retaliatory discharge grievance that was in fact exhausted timely. The District of Columbia Circuit has made it perfectly clear that "adequacy of notice is the core of Title VII's administrative exhaustion requirements." *Id.* (citing *Loe v. Heckler*, 768 F.2d 409, 417–18 (D.C.Cir.1985)) (stating that agency must have "notice of [a plaintiff's] grievance and a fair opportunity to provide full redress or to attempt an informal accommodation. Title VII requires no more."). And the DOL was certainly on notice of these previously filed grievances by the plaintiff, as the retaliatory discharge grievance was the fourth and last grievance filed by the plaintiff. Moreover,

this is not a case where the plaintiff failed to act diligently to pursue her rights. *See Cristwell v. Veneman*, 224 F.Supp.2d 54 (D.D.C.2002) (Walton, J.) (finding the plaintiff failed to exhaust administrative remedies where he failed to timely comply with each administrative deadline and offered no evidence that he acted in a diligent manner or that equitable principles should apply). In fact, what this case represents is a plaintiff who filed four separate grievances within a one year period, assiduously seeking to pursue her claims in the administrative forum, only to have her efforts frustrated by the substantial time delays in conducting arbitration hearings on her grievances. The plaintiff, according to her allegations, was finally able to present her retaliatory discharge claim at her arbitration hearing, which was the culmination of all the alleged discriminatory events that ultimately resulted in the termination of her employment with the DOL. To deny the plaintiff the opportunity to litigate her hostile work environment and merit system violation claims that clearly underlie the claim that was timely exhausted in the administrative process would unnecessarily frustrate Congress's intent to rid the work-place of discrimination.

## IV. *Conclusion*

For the aforementioned reasons, this Court finds that it must grant in part and deny in part the defendants' partial motion to dismiss this case. The Court will grant the defendants' motion to dismiss the plaintiffs claims brought pursuant to the FTCA because Defendant Schoepfle is not a proper party and the United States is immune from such claims under the discretionary function exception to the FTCA. The Court therefore lacks subject matter jurisdiction over these claims. However, the Court will deny the defendants' motion to dismiss the plaintiff's hostile work envi-

ronment and merit system violation claims because it infers, in the absence of the defendant proving otherwise, that these claims were considered in the February 2000 retaliatory discharge arbitration challenge that was timely exhausted at the administrative level. In any event, dismissal would be improper because the defendant clearly had ample notice of these claims, which underlie the plaintiff's grievance that was exhausted timely.[13]

### ORDER

Upon consideration of the defendants' partial motion to dismiss the complaint, and for the reasons set forth in the Memorandum Opinion accompanying this Order, it is hereby,

**ORDERED** that the defendants' motion to dismiss the plaintiff's negligent infliction of emotional distress and intentional infliction of emotional distress claims is **GRANTED**; and it is

**FURTHER ORDERED** that the defendants' motion to dismiss the plaintiff's hostile work environment and merit system violation claims brought pursuant to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act is **DENIED**.

13. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.